# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

GORDON-DARBY HOLDINGS, INC.,

*Plaintiff-Appellee,*

v.

ROBERT L. QUINN, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE NEW HAMPSHIRE DEPARTMENT OF SAFETY; ROBERT R. SCOTT, IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE NEW HAMPSHIRE DEPARTMENT OF ENVIRONMENTAL SERVICES,

*Defendants-Appellants.*

On Appeal from The United States District Court
for the District of New Hampshire, Case No. 25-cv-508
The Honorable Landya McCafferty

## AMICI CURIAE BRIEF OF WEST VIRGINIA AND 24 OTHER STATES IN SUPPORT OF APPELLANTS AND REVERSAL

JOHN B. MCCUSKEY
  *Attorney General*

OFFICE OF THE WEST
VIRGINIA ATTORNEY
GENERAL
1900 Kanawha Blvd., East
Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
mwilliams@wvago.gov
hwilson@wvago.gov

MICHAEL R. WILLIAMS
  *Solicitor General*
  *Counsel of Record*

HOLLY J. WILSON
  *Principal Deputy Solicitor*
  *General*

*Counsel for the State of West Virginia*

# TABLE OF CONTENTS

Table of Contents.................................................................................. ii

Table of Authorities........................................................................... iii

Introduction.........................................................................................1

Interests of Amici Curiae....................................................................3

Argument..............................................................................................5

    I.  Section 7604 Authorizes Suits Only for Ongoing or Repeated Violations—Not Predicted Future Ones .......................................6

    II. The Court Should Reject a Prospective Reading to Avoid Serious Constitutional Problems ...........................................................11

        A.    Allowing Prospective Suits Would Transfer Core Executive Power to Private Parties .........................................................12

        B.    A Prospective Reading Would Override State Authority............19

            1.  Plaintiff's Reading Seizes State Enforcement Authority ....20

            2.  Plaintiff's Reading Commandeers State Legislative Authority ........................................................................23

        C.    Prospective Suits Would Exceed Article III by Inviting Hypothetical Disputes .......................................................26

Conclusion..........................................................................................32

Additional Counsel.............................................................................33

Certificate of Compliance .................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
585 U.S. 579 (2018)..................................................................................31

*In re Aiken Cnty.,*
725 F.3d 255 (D.C. Cir. 2013).............................................................12, 14, 17

*Alden v. Maine,*
527 U.S. 706 (1999)..................................................................................19

*Bennett v. Spear,*
520 U.S. 154 (1997)..................................................................................27

*Blodgett v. Holden,*
275 U.S. 142 (1927)..................................................................................11

*Bond v. United States,*
564 U.S. 211 (2011)..................................................................................19

*Brown v. EPA.,*
521 F.2d 827 (9th Cir. 1975).....................................................................24

*Buckley v. Valeo,*
424 U.S. 1 (1976).....................................................................................14

*City & Cnty. of S.F. v. U.S. Dep't of Transp.,*
796 F.3d 993 (9th Cir. 2015).....................................................................25

*Conservation L. Found., Inc. v. Acad. Express, LLC,*
129 F.4th 78 (1st Cir. 2025).................................................................19, 20

*Conservation L. Found. of New England, Inc. v. Reilly,*
950 F.2d 38 (1st Cir. 1991).................................................................18, 27

*Crowell v. Benson,*
285 U.S. 22 (1932).............................................................................11, 12

*Dep't of Transp. v. Ass'n of Am. R.R.s,*
  575 U.S. 43 (2015)..................................................................12

*Diamond Alt. Energy, LLC v. EPA,*
  606 U.S. 100 (2025)................................................................26

*District of Columbia v. Train,*
  521 F.2d 971 (D.C. Cir. 1975)...............................................24

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.,*
  123 F.4th 309 (5th Cir. 2024) ...............................................26

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024)...............................................................27

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
  528 U.S. 167 (2000).........................................12, 14, 15, 28, 29, 30

*Friends of the Earth v. Carey,*
  422 F. Supp. 638 (S.D.N.Y. 1976).......................................24

*Friends of the Earth v. Carey,*
  552 F.2d 25 (2d Cir. 1977) ....................................................25

*Friends of Sakonnet v. Dutra,*
  738 F. Supp. 623 (D.R.I. 1990) ..............................................8

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991).................................................................19

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,*
  484 U.S. 49 (1987)................................................1, 6, 7, 9, 10, 20

*Heckler v. Chaney,*
  470 U.S. 821 (1985)....................................................14, 16, 20

*Herrera-Inirio v. I.N.S.,*
  208 F.3d 299 (1st Cir. 2000) .................................................23

*Jennings v. Rodriguez,*
  583 U.S. 281 (2018)................................................................11

*Jensen v. R.I. Cannabis Control Comm'n,*
  160 F.4th 18 (1st Cir. 2025)................................................31

*Kong v. United States,*
  62 F.4th 608 (1st Cir. 2023)................................................12

*Lucia v. SEC,*
  585 U.S. 237 (2018)................................................13

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992)................................................12, 13, 14

*Miss. Comm'n on Env't Quality v. EPA,*
  790 F.3d 138 (D.C. Cir. 2015)................................................23

*Missouri v. Jenkins,*
  515 U.S. 70 (1995)................................................30

*Murphy v. NCAA,*
  584 U.S. 453 (2018)................................................25

*Myers v. United States,*
  272 U.S. 52 (1926)................................................13

*N.H. Lottery Comm'n v. Rosen,*
  986 F.3d 38 (1st Cir. 2021) ................................................31

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012)................................................19

*New State Ice Co. v. Liebmann,*
  285 U.S. 262 (1932)................................................21

*Nike, Inc. v. Kasky,*
  539 U.S. 654 (2003)................................................16

*Nixon v. Fitzgerald,*
  457 U.S. 731 (1982)................................................13

*Noem v. Vasquez Perdomo,*
  146 S. Ct. 1 (2025) ................................................30

*Printz v. United States,*
521 U.S. 898 (1997) ..................................................................23

*Rust v. Sullivan,*
500 U.S. 173 (1991) ..................................................................11

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.,*
723 F. Supp. 2d 1247 (E.D. Cal. 2010) ....................................9

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*
591 U.S. 197 (2020) ..................................................13, 15, 17

*Sierra Club v. Korleski,*
681 F.3d 342 (6th Cir. 2012) ..................................................25

*Steel Co. v. Citizens for a Better Env't,*
523 U.S. 83 (1998) ....................................................12, 27, 28

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) ............................................................29, 30

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ......................................16, 27, 29, 30

*United Sav. Ass'n of Tex.* v. *Timbers of Inwood Forest Assocs., Ltd.,*
484 U.S. 365 (1988) ..................................................................10

*United States v. Jicarilla Apache Nation,*
564 U.S. 162 (2011) ....................................................................8

*United States v. Nixon,*
418 U.S. 683 (1974) ..................................................................13

*United States v. Texas,*
599 U.S. 670 (2023) ............................................................14, 26

*United States v. Xcel Energy, Inc.,*
759 F. Supp. 2d 1106 (D. Minn. 2010) ....................................9

*Vinmar Overseas, Ltd. v. OceanConnect, LLC,*
No. CIV.A. H-11-4311, 2012 WL 3599486 (S.D. Tex. Aug. 20, 2012) ..................................................................................25

*Virginia v. Browner,*
80 F.3d 869 (4th Cir. 1996)..................................................24

*West Virginia v. EPA,*
597 U.S. 697 (2022)...........................................................10

**Statutes**

42 U.S.C. § 7509(b)..............................................................23

42 U.S.C. § 7604(a)(1) ........................................................5, 8

42 U.S.C. § 7604(b)(1)(A).....................................................10

42 U.S.C. § 7604(b)(1)(B).....................................................15

**Other Authorities**

136 Cong. Rec. 35,360 (1990) ..............................................7

Act of Nov. 15, 1990, Pub. L. No. 101-549, 1990 U.S.C.C.A.N. (104 Stat. 2399) 3887-1 (Statement of President George H. Bush), 1990 WL 300973 ...............................................................8

Charles S. Abell, *Ignoring the Trees for the Forests: How The Citizen Suit Provision of the Clean Water Act Violates the Constitution's Separation of Powers Principle*, 81 VA. L. REV. 1957 (1995) ............................................................15, 20, 21

Frank B. Cross, *Rethinking Environmental Citizen Suits*, 8 TEMP. ENV'T L. & TECH. J. 55 (1989)..................................21, 22

Jonathan H. Adler, *Stand or Deliver: Citizen Suits, Standing, and Environmental Protection*, 12 DUKE ENV'T L. & POL'Y F. 39 (2001) .........................................................................21

U.S. CONST. art. II, § 2.........................................................13

## INTRODUCTION

New Hampshire has decided to revisit its vehicle inspection program. That choice alone isn't notable; States reassess their own laws all the time. But what *is* notable is what came next. A disgruntled contractor who stood to lose money from the loss of its lucrative inspection program turned to the Clean Air Act—an environmental protection statute—to stop New Hampshire's democratic initiative in its tracks. The district court then indulged this rent-seeking effort, assuming the power to order a State to reverse its own legislative judgment. It did so even though New Hampshire had not yet violated any provision of the Clean Air Act and even though it was actively engaged with the Environmental Protection Agency to ensure compliance. A citizen suit thus became a preemptive strike.

Congress created environmental citizen suits to fill gaps in federal and state enforcement efforts—not to replace them. Consistent with that limited remit, the Supreme Court drew a hard boundary around citizen suits in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49 (1987). To sue, a plaintiff must allege ongoing or intermittent violations. Suits based on "wholly past" violations fall outside citizen suit provisions like the one implicated here. *Id.* at 57.

The district court erased *Gwaltney I*'s boundary, this time from the other side. By permitting a private party to sue over purported violations that haven't happened yet, the lower court stretched the statute's "in violation of" language past what the text can bear—and past what *Gwaltney I* permits. That ruling hands over to private plaintiffs the kind of broad enforcement authority that belongs to the Executive and the States. And it puts a private party's Article III standing in jeopardy.

This Court can rein things back in. Section 7604's text is clear, and it doesn't authorize suits based on potential future violations. Read in context and in light of *Gwaltney I*, Section 7604 permits suits only for ongoing or intermittent violations. That straightforward reading resolves this case without any need to confront difficult constitutional questions.

Even if Section 7604 were ambiguous, the result would be the same. Expanding citizen suit authority to reach prospective violations raises serious concerns under Article II, Article III, and basic principles of federalism. Citizen suits have a role to play, but only within constitutional limits. The Court should read Section 7604 narrowly to preserve the Executive's duty to enforce the law and the States' sovereign role in doing so. And Section 7604

2

shouldn't push hypothetical and abstract claims that standing doctrine says have no place in federal courts.

A here-and-now reading of the statute wouldn't weaken environmental protection, either. It would strengthen it. A restrained reading of Section 7604 preserves coordinated, accountable enforcement by federal and state regulators whose mandate is environmental protection. In contrast, the district court's view fragments that authority among private litigants who are not obliged to consider broader policy consequences. Indeed, as this case shows, private litigants might be motivated by things divorced from the environmental concerns the statute was meant to address, such as economic self-preservation.

The judgment below should be reversed.

## INTERESTS OF AMICI CURIAE

Amici Curiae West Virginia, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and Wyoming are States that bear primary responsibility for implementing and enforcing federal environmental law within their borders. Through delegated programs and

independent state-law regimes, they issue permits, monitor compliance, and bring enforcement actions tailored to local conditions. Their efforts reflect not only federal mandates but also state policy judgments about how best to protect natural resources while sustaining economic growth and energy reliability.

Citizen suit provisions affect that work. When properly bounded, they might complement enforcement by addressing discrete violations that public authorities have not immediately pursued. But when those suits expand, they risk displacing the States' considered judgments about enforcement priorities, timing, and remedies.

States also have a distinct structural interest in maintaining the proper constitutional separation of power. Decisions about whether, when, and how to enforce the law involve discretion, prioritization, and accountability—features that the Constitution assigns to the Executive Branch. When private parties exercise that authority without meaningful supervision, it diminishes both federal accountability and the States' ability to coordinate with federal regulators. The consequences are worse when these private parties target the States themselves, as here.

Finally, the States have a strong interest in preserving cooperative federalism schemes in environmental statutes. Those laws rely on a partnership between federal and state governments, not a system in which private litigants can take over. Ensuring that citizen suits remain consistent with Article II and Article III helps maintain that balance.

Amici States therefore have a substantial interest in this case.

## ARGUMENT

Section 7604(a)(1) of the CAA authorizes citizen suits against any person "who is alleged to have violated (if … the alleged violation has been repeated)" or "who is alleged to … be in violation of" an emission standard or limitation. 42 U.S.C. § 7604(a)(1). Below, the district court interpreted "in violation of" to include suits alleging wholly future violations. That was wrong.

The plain text says that citizen suits are limited to those alleging ongoing or intermittent violations; it does not allow suits for violations that have not yet happened. Even more, reading the citizen suit provision the district court's way runs headlong into a constitutional quagmire—one this Court is obligated to avoid. Questions involving Article II, federalism, and Article III rear their heads when courts read citizen suit provisions broadly. Section 7604(a)(1)

5

must be limited to save our constitutional order—and particularly, States' rights.

## I. Section 7604 Authorizes Suits Only for Ongoing or Repeated Violations—Not Predicted Future Ones.

The Supreme Court's decision in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49 (1987), does much of the work here. Yet the district court still stumbled. It misread *Gwaltney I*, failed to account for legislative changes, and strained the English language. This Court should reject the district court's reading.

In *Gwaltney I*, the Supreme Court considered whether the Clean Water Act's analogous citizen suit provision—which allows suits when a defendant is "in violation of" the CWA—permits suits for wholly *past* violations. *Gwaltney I*, 484 U.S. at 56-58. It said no. *Id.* The words "in violation of" required "a state of either continuous or intermittent violation" so that "a reasonable likelihood [exists] that *a past polluter* will *continue* to pollute in the future." *Id.* at 57 (emphasis added). The phrase's present tense grounded the harm "in the present or the future, not in the past." *Id.* at 59.

But by mentioning violations "in the future," the Supreme Court didn't hold that violations can be *entirely* in the future. The suit-worthy future violations must be reasonably likely to be committed by a "past polluter."

6

*Gwaltney I*, 484 U.S. at 57. Again: A past polluter. The future-looking element in *Gwaltney I* was never free-floating—it was always anchored to a history of actual violations. The Court's analysis of "intermittent" violations confirms this: the archetypal case it had in mind was the polluter who "violates permit limitations one month out of every three"— someone who has already violated and is likely to do so again. *Id.* at 57, 63. That situation is different from a defendant who has not violated the CAA but might in the future. Intermittent violations are akin to present ones, so the suit isn't premature or late. Not so for a violation that has not yet come to be. So "in violation of" means either presently violating or sure to violate again. The district court was wrong to conclude otherwise.

More problematic, the district court failed to appreciate that the language in Section 7604(a)(1) doesn't match the language analyzed in *Gwaltney I* exactly—and the difference proves to be material here. At the time *Gwaltney I* issued, the CWA's citizen suit provision, like the CAA's citizen suit provision, contained a single trigger: a defendant "alleged to be in violation." *Gwaltney I*, 484 U.S. at 53 (cleaned up). But in 1990, Congress "modified the [CAA's] citizen suit provision on past violations to conform to the Supreme Court's *Gwaltney* decision." 136 Cong. Rec. 35,360 (1990)

(statement of Rep. Norman Lent). It clarified that "litigants must show, at a minimum, intermittent, rather than purely past, violations of the statute in order to bring suit." Act of Nov. 15, 1990, Pub. L. No. 101-549, 1990 U.S.C.C.A.N. (104 Stat. 2399) 3887-1 (Statement of President George H. Bush), 1990 WL 300973. Now, the CAA's provision contains two triggers: a defendant "alleged to have violated (if … the alleged violation has been repeated) *or* to be in violation of" an applicable standard. 42 U.S.C. § 7604(a)(1) (emphasis added).

The new language codified *Gwaltney I*. The first prong (repeated past violations) captures the backward-looking "intermittent" case; the second prong captures the "ongoing" case. Given the addition of an express condition ("repeated") in the first clause, and the use of present tense ("to *be*") in the second, neither captures a prospective case, one *Gwaltney I* didn't contemplate. *See, e.g.*, *Friends of Sakonnet v. Dutra*, 738 F. Supp. 623, 632 (D.R.I. 1990) (finding that the CWA citizen suit provision was appropriately invoked when "the violation of the Act has been continuing and *was occurring when the suits in this case were filed*" (emphasis added)). And this reading avoids surplusage—an appropriate aim given that courts are always "hesitant to adopt" a reading that doesn't. *See United States v. Jicarilla Apache*

8

*Nation*, 564 U.S. 162, 185 (2011) (cleaned up). Each clause has a distinct meaning, while the district court's approach combined the two provisions into one.

Ordinary, plain English dictates the same result. "In violation of" is a state-of-being prepositional phrase connoting a current, ongoing state. *Gwaltney I*, 484 U.S. at 69 (Scalia, J., concurring). "Unlike the phrase 'to be violating' or 'to have committed a violation,'" "in violation of" "suggests a state rather than an act—the opposite of a state of compliance." *Id.* If a driver has not yet run the red light, no one would say the driver "is in violation of" the traffic code. *See, e.g.*, *United States v. Xcel Energy, Inc.*, 759 F. Supp. 2d 1106, 1112 (D. Minn. 2010) (rejecting EPA argument that it was empowered to "inquire as to whether any person *will be* in violation of the CAA" under statute empowering it "to determine 'whether any person is in violation' of the CAA's requirements (quoting 42 U.S.C. § 7414(a))); *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F. Supp. 2d 1247, 1282 (E.D. Cal. 2010) ("[Where the] prohibited [act] has not yet occurred, however, so it cannot be said that the [defendant] is currently 'alleged to be in violation' of [a] statute [with a citizen-suit provision].").

Finally, put Section 7604(a)(1) in its proper "place in the overall statutory scheme." *West Virginia v. EPA,* 597 U.S. 697, 721 (2022) (cleaned up). "A provision … is often clarified by" its "context," and that proves true here. *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371 (1988). Under Section 7604(b)(1), a plaintiff must give 60-days' notice "of the violation" to the EPA, "the State in which the violation occurs," and "any alleged violator." 42 U.S.C. § 7604(b)(1)(A). Congress intended the 60-day notice requirement to give "the alleged violator … an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit." *Gwaltney I*, 484 U.S. at 59-60. That purpose presupposes a defendant who is *currently* out of compliance and *capable* of curing the violation during the 60-day window. And notice goes to the State where the violation "occurs"—present tense. 42 U.S.C. § 7604(b)(1)(A).

Yet under the district court's rule, the 60-day cure period becomes a pure formality. If the violation is wholly prospective, the notice is sent while the defendant is following the CAA. During the 60-day period, the violator has nothing to cure. That 60-day window is thus not an "opportunity" for the violator "to bring itself into complete compliance." *Gwaltney I*, 484 U.S. at 59-60. It is a waiting period with no purpose at all. It's not clear what State notice

10

should be sent to, either, because at the time notice is sent, no violation in a State "occurs."  A reading that renders the notice mechanism meaningless is one the Court should reject.

So Section 7604 is limited to suits alleging intermittent or ongoing violations.

## II.    The Court Should Reject a Prospective Reading to Avoid Serious Constitutional Problems.

The text resolves the matter.  But even if some ambiguity remains, permitting citizen suits for wholly future violations raises serious constitutional questions this Court must avoid.  This Court should limit Section 7604 to keep Article II, Article III, and our federalist system of government intact.

Under the constitutional avoidance canon, courts confronted with multiple plausible readings of a statute have the "plain duty" to adopt the one that avoids a serious constitutional question. *Blodgett v. Holden*, 275 U.S. 142, 148 (1927); *see Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018).  The rule is a "cardinal principle" of statutory construction. *Crowell v. Benson*, 285 U.S. 22, 62 (1932).  And courts follow this canon "out of respect for Congress," which courts "assume legislates in the light of constitutional limitations." *Rust v. Sullivan*, 500 U.S. 173, 191 (1991).  So whenever even a "serious doubt of

constitutionality is raised," courts will favor a narrow, limited construction. *Crowell*, 285 U.S. at 62; *see also, e.g.*, *Kong v. United States*, 62 F.4th 608, 615-16 (1st Cir. 2023) (relying on constitutional-avoidance canon to adopt limited interpretation of immigration statute).

The avoidance canon has significant bite in the citizen suit context; these provisions already exist at the edge of constitutionality. Multiple Justices have noted unresolved separation of powers questions in this space. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring); *id.* at 204-05, 209 (Scalia, J., dissenting); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (Scalia, J.); *see Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 62 (2015) (Alito, J., concurring); *In re Aiken Cnty.*, 725 F.3d 255, 264 n.9 (D.C. Cir. 2013) (Kavanaugh, J.); *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 129 (1998) (Stevens, J., concurring) (recognizing but dismissing Article II argument). So the case for narrowing, rather than expanding, citizen suit provisions is overwhelming.

## A. Allowing Prospective Suits Would Transfer Core Executive Power to Private Parties.

Section 7604 already toes Article II's line, and allowing suits for purely prospective violations will push it over the limit.

Under Article II, "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. CONST. art. II, §1, cl. 1). This power to execute the laws brings a necessary implication: the President must be able to exercise "supervisory … responsibilit[y]" over his subordinates, *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982), and "general administrative control of those executing the laws," *Myers v. United States*, 272 U.S. 52, 117, 163-64 (1926). Otherwise, it would be "impossible" for him to do his job. *Id.* Hand-in-hand with these powers, Article II gives the President "essential" authority to select and appoint his people, *id.*—those with a "continuing" office wielding "significant authority," *Lucia v. SEC,* 585 U.S. 237, 245 (2018) (cleaned up). *See* U.S. CONST. art. II, § 2.

So the President and his team have full control over enforcement decisions—whether to pursue a violation or not. Indeed, such execution decisions are the Executive's "most important constitutional duty." *Lujan*, 504 U.S. at 577. The President has the "exclusive authority and absolute discretion to decide whether to prosecute a [criminal] case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). He has the "absolute discretion" to decide to

enforce (or not to enforce) civil violations. *Heckler v. Chaney*, 470 U.S. 821, 830-32 (1985); *see United States v. Texas*, 599 U.S. 670, 678–679 (2023). Civil enforcement power is also "presumptively an exclusive Executive power." *In re Aiken Cnty.*, 725 F.3d at 264 n.9 (Kavanaugh, J.). After all, "a lawsuit is the ultimate remedy for a breach of the law," and the Constitution "entrusts" that "responsibility" only "to the President." *Buckley v. Valeo*, 424 U.S. 1, 138 (1976).

Citizen suit provisions, including Section 7604, place the Executive's most important constitutional function in private hands. They strip the Executive of its enforcement authority and discretion; rob the President of his ability to supervise those who enforce the law on his behalf; and deputize private attorneys general without Presidential appointment. The practical result: "difficult and fundamental" Article II questions. *Laidlaw*, 528 U.S. at 197 (Kennedy, J., concurring).

When a citizen sues under Section 7604, she is not vindicating a personal injury. She is advancing "the undifferentiated public interest in . . . compliance with the law." *Lujan*, 504 U.S. at 577. But "[v]indicating the public interest … is the function of Congress and the Chief Executive"—not private parties. *Id.* at 576 (emphasis omitted). And when she seeks civil penalties payable to

the Treasury, the point is clearer still. The power to seek such "public remedies," *Laidlaw*, 528 U.S. at 210 (Scalia, J., dissenting), like civil penalties, is "a quintessentially executive power," *Seila L. LLC*, 591 U.S. at 219. Indeed, plaintiffs "pursuing civil penalties act[] as a self-appointed mini-EPA." *Laidlaw*, 528 U.S. at 209 (Scalia, J., dissenting). They "are performing two law enforcement functions, usually reserved for Executive Branch officials: the prosecution of violations of federal environmental law and the enrichment of the United States Treasury." Charles S. Abell, *Ignoring the Trees for the Forests: How The Citizen Suit Provision of the Clean Water Act Violates the Constitution's Separation of Powers Principle*, 81 VA. L. REV. 1957, 1978 (1995). And of course, no President nominated these plaintiffs. No Senate confirmed them.

The Executive has no meaningful way to control these suits, either. Save bringing its own enforcement action, the government cannot prevent a citizen from filing. *See* 42 U.S.C. § 7604(b)(1)(B). The Executive cannot force her to conform to executive enforcement policy. And once a citizen files, the Executive cannot limit her participation, redirect the litigation, or bring it to a close. *See* Abell, *supra* at 1972-73. "[A]ll the government may do is nudge it a little in one direction or another." *Id.*

Private plaintiffs also are "unencumbered by the legal and practical checks" that constrain public agencies. *Nike, Inc. v. Kasky*, 539 U.S. 654, 679-80 (2003) (Breyer, J., dissenting). They may sue based on their own personal beliefs—or self-interest—rather than any coherent enforcement policy. *Id.* at 680. Government agencies must weigh resources, competing enforcement priorities, and regulated parties' reliance interests. *See Heckler*, 470 U.S. at 831-32 (enforcement decisions involve "a complicated balancing of a number of factors which are peculiarly within [the Executive's] expertise"). But citizen plaintiffs don't have this same global view. And they "are not accountable" to anyone—not the electorate, not the regulated industry, and not the President—when their judgment proves wrong. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021). They're not even "charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law." *Id.*

Worse, citizen suits can produce results that contradict the Executive's own enforcement choices. The President may decide—as a matter of policy—that certain violations are better left unpursued. That's his prerogative. *See Heckler*, 470 U.S. at 831-32. "One of the greatest unilateral powers a President possesses" is "the power to protect individual liberty by essentially under-

enforcing federal statutes." *In re Aiken Cnty.*, 725 F.3d at 264 (Kavanaugh, J.). But under Section 7604, a private plaintiff can override that choice. She can sue to enforce the very provision the Executive has chosen to leave be. And the government can do almost nothing to stop her.

*Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020), brings the issue into focus. There, the Supreme Court held that "an independent agency led by a single Director and vested with significant executive power" had "no place in our constitutional structure." *Id.* at 220. The Court held unconstitutional a for-cause removal restriction protecting the CFPB's single Director—an officer Senate-confirmed, bound by statute, and at least theoretically removable for cause—because even that limit on Presidential authority was too much. *Id.* at 222-26.

A citizen plaintiff is a more acute version of the same structural defect. Like the CFPB Director, she wields significant executive authority: prosecuting violations of federal law and channeling penalties into the federal Treasury. But unlike the Director, she was never appointed, was never confirmed, is answerable to no one, and cannot be removed at all. The President's only tool against an errant CFPB Director—removal for cause—does not exist here. If insulating a single presidentially-appointed officer from

at-will removal violates Article II, it strains logic to conclude that vesting enforcement authority in a wholly private individual—one the President cannot supervise, redirect, or remove under any standard—does not.

Too, construing Section 7604 to reach prospective violations makes an already serious Article II problem worse. The existing statute at least limits the plaintiff class to those who can allege a current violation. The plaintiff is thus acting to abate a public harm that could theoretically be affecting the plaintiff. A prospective-violations reading severs even that tether. It opens the courthouse doors to plaintiffs who have identified no present wrongdoing, only a predicted future one. It creates a new enforcement mechanism, one in which private parties, answerable to no one, may police conduct the Executive has not yet chosen to pursue, hasn't had the chance to pursue, and may never choose to pursue.

Ultimately, "adjudication of … non-individualized, abstract issues [from citizen suits] raise serious separation of powers concerns by setting the courts on a collision course with the executive branch." *Conservation L. Found. of New England, Inc. v. Reilly*, 950 F.2d 38, 43 (1st Cir. 1991). To avoid this "collision," the Court should read Section 7604 as narrowly as possible. *Id.*

18

**B. A Prospective Reading Would Override State Authority.**

Federalism is not just a nicety. The federalist structure "assures a decentralized government that will be more sensitive to the diverse needs of a heterogeneous society" and "allows for more innovation and experimentation in government." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). The States retain broad "residuary and inviolable sovereignty" over their legislative and enforcement prerogatives. *Alden v. Maine*, 527 U.S. 706, 715 (1999) (cleaned up). After all, state governments are closer to their citizens than the federal government. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012); *Bond v. United States*, 564 U.S. 211, 221 (2011). They know their local conditions, priorities, and tradeoffs better. And they're accountable to their electorates—a check no private plaintiff can replicate.

States also have a special role under the CAA. The Act "divides responsibilities among state and federal governments." *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 82 (1st Cir. 2025). EPA sets baseline standards. *Id.* States bear the "primary responsibility" for ensuring compliance with them. *Id.* (quoting 42 U.S.C. § 7401(a)(3)). States carry out that responsibility through State Implementation Plans, or SIPs. *Id.* Those plans reflect each State's judgment about how best to achieve air quality goals

within its borders, tailored to local conditions and local priorities. *See id.* at 82-83. States have flexibility—by design.

### 1. Plaintiff's Reading Seizes State Enforcement Authority.

Because the CAA employs a cooperative federalism scheme, the Executive shares enforcement power with the States. So the States suffer from unduly expansive private enforcement in much the same way as the federal government. Section 7604 frustrates States' policy and enforcement goals under the CAA—undermining basic principles of federalism. And a prospective-violations reading of Section 7604 would destroy the delicate federal-state balance in this sphere. Citizen suits under the CAA are supposed to supplement State enforcement. They're not supposed to supplant it. *Gwaltney I*, 484 U.S. at 60; Abell, *supra* at 1961-62. But they do.

Section 7604 overrides discretionary state enforcement decisions—just as it overrides the Executive's enforcement decisions. *See supra* Section II.A. The parallel is exact. A state official may decide, as a matter of policy, that a particular violation is better addressed through negotiation, technical assistance, or a compliance schedule than through litigation. That is her call to make; the same way enforcement decisions belong to the Executive. *See Heckler*, 470 U.S. at 831-32. But under Section 7604, a private plaintiff can

supersede that choice. She can sue to enforce the very provision the State has decided to address on its own terms, or not at all. And the State can do almost nothing to stop her. *See* Abell, *supra* at 1972-73. The State's only check is to bring its own enforcement action first and trigger Section 7604(b)(1)(B)'s diligent-prosecution bar. But that option is no option at all; it is a gun to the State's head. And unlike state officials, the private plaintiff "face[s] no significant political repercussions for setting unwise enforcement priorities." Jonathan H. Adler, *Stand or Deliver: Citizen Suits, Standing, and Environmental Protection*, 12 DUKE ENV'T L. & POL'Y F. 39, 49 (2001).

Section 7604 also stifles States' creative latitude. Cooperative federalism has an important benefit: "a single courageous State may, if its citizens choose, serve as a laboratory[] and try novel social and economic experiments." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). States want to use that laboratory. But with Section 7604, citizen plaintiffs can step in the moment a violation appears, ending States' ideas before they've had a chance to try them.

The result is enforcement that is "inconsistent and unfair," as private plaintiffs "pursue even small and unavoidable violations" regardless of whether doing so serves anyone's environmental interests. Frank B. Cross,

*Rethinking Environmental Citizen Suits*, 8 TEMP. ENV'T L. & TECH. J. 55, 66 (1989). Indeed, "citizen enforcement may not be an effective means of ensuring the most efficient implementation of environmental laws." *Id.* at 64. And in some cases, it "may even frustrate the objective of environmental protection." *Id.* For, "[w]hen enforcement appears excessive, unfair, or unreasonable, it may spawn a 'culture of resistance'" and hobble cooperative compliance. *Id.* at 67 (cleaned up).

More suits do not mean cleaner air. They mean less room for the State experimentation and discretion Congress built into the CAA from the start.

Opening Section 7604 up for prospective violations compounds these issues. Under the district court's rule, a private plaintiff may haul a defendant into court before the State has assessed anything, before the SIP process has been tested, and before any state enforcement official has decided the conduct warrants action. The defendant is in full compliance. The State has nothing to negotiate, calibrate, or pursue—yet. The 60-day notice requirement, which exists, in part, to give States a first-mover window, turns into an ultimatum. What results is a private plaintiff, armed with a prediction, setting the State's enforcement agenda for conduct the State might never have chosen to pursue.

**2. Plaintiff's Reading Commandeers State Legislative Authority**.

These federalism problems are still worse when, as here, a State finds itself the target of a citizen suit. Under the Tenth Amendment, of course, "[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). In other words, the Tenth Amendment prevents the federal government from "treat[ing] state governments as federal handmaidens." *Herrera-Inirio v. I.N.S.*, 208 F.3d 299, 307 (1st Cir. 2000). For that reason, the CAA takes a carrot-and-stick approach to regulation, withholding federal monies and directing substitutions of federal plans when state authorities are thought to fall short as regulators. *See, e.g.*, 42 U.S.C. § 7509(b); *see also Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 179 (D.C. Cir. 2015) (holding that these more limited measures are permissible under the Tenth Amendment).

When EPA tried to get more aggressive—and ordered the States to impose EPA-preferred policies—courts responded by flagging the serious commandeering concerns that resulted. Accepting EPA's command-and-control approach would have impermissibly "reduce[d] the

states to puppets." *Brown v. EPA.*, 521 F.2d 827, 839 (9th Cir. 1975), *vacated after Government concession*, 431 U.S. 99 (1977). Such a "proposed interpretation [w]as 'astonishing'" because a state legislature "would have been directly compelled to regulate." *Virginia v. Browner*, 80 F.3d 869, 883 (4th Cir. 1996) (quoting *Maryland v. EPA*, 530 F.2d 215, 224 (4th Cir. 1975), *vacated after Government concession sub nom. EPA v. Brown*, 431 U.S. 99 (1977)); *accord District of Columbia v. Train*, 521 F.2d 971, 994 (D.C. Cir. 1975), *vacated after Government concession sub nom. EPA v. Brown*, 431 U.S. 99 (1977).

Citizen suits like the one brought here raise all these same concerns. The court below ordered New Hampshire to reimplement a program that its state legislature had determined should not live on. The court—at plaintiff's prompting—thus assumed the very power to direct legislation that so many courts have already refused to grant EPA. Yet *who* is imposing the federal mandate makes no material difference; it's an imposition all the same. That idea has been recognized almost as long as the CAA itself. One early district court explained that "citizen's suits are authorized against the states and their subdivisions[] only to the extent that they are actual polluters" because of commandeering problems. *Friends of the Earth v. Carey*, 422 F. Supp. 638,

643 (S.D.N.Y. 1976).  Although the Second Circuit later disagreed (by applying the watered-down conception of the anti-commandeering doctrine that applied at the time), *Friends of the Earth v. Carey*, 552 F.2d 25, 38 (2d Cir. 1977), the logic proves compelling under today's conception of the anti-commandeering doctrine, *see Murphy v. NCAA*, 584 U.S. 453, 475 (2018) (rejecting the argument that the federal government can command States not to implement new legislation).

Decades later, courts have recognized that the early New York district court's thinking was right.  The Sixth Circuit thought so, holding that the Clean Air Act "does not permit citizen suits against state regulators *qua* regulators" in part because plaintiffs could otherwise "sue not merely to induce, but to compel the State to implement the SIP—which again is contrary to the sanctions regime."  *Sierra Club v. Korleski*, 681 F.3d 342, 350-51 (6th Cir. 2012); *see also Vinmar Overseas, Ltd. v. OceanConnect, LLC*, No. CIV.A. H-11-4311, 2012 WL 3599486, at *7-9 (S.D. Tex. Aug. 20, 2012) (collecting "holdings … that such citizen-suit provisions only authorize claims that a regulated entity, and not a regulating agency, violated an emissions standard or limitation").  So too did the Ninth.  *See City & Cnty. of S.F. v. U.S. Dep't of Transp.*, 796 F.3d 993, 1001 (9th Cir. 2015).  And by allowing citizen suits

against States based on *future* violations, private plaintiffs seize control of the legislative process before state legislators even get a turn at bat, aggravating the commandeering problem.

Altogether, a narrower reading of the CAA's citizen suit provision is the only one that keeps States where Congress put them: in the driver's seat.

### C. Prospective Suits Would Exceed Article III by Inviting Hypothetical Disputes.

"The Clean Air Act's citizen-suit provision already 'push[es] against the limits of Article III,'" too.  *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 123 F.4th 309, 395 (5th Cir. 2024) (Oldham, J., dissenting) (cleaned up). The district court's decision only makes this "constitutional tension" worse. *Id.*

"The Constitution affords federal courts considerable power, but it does not establish government by lawsuit." *United States v. Texas*, 599 U.S. 670, 704 (2023) (Gorsuch, J., concurring) (cleaned up).  To this end, to satisfy Article III's "case" or "controversy" requirement, "plaintiffs must answer a basic question—'What's it to you?'" *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 110 (2025) (cleaned up).

"[T]he irreducible constitutional minimum of standing contains three elements: injury in fact, causation, and redressability." *Diamond Alt. Energy,*

*LLC*, 606 U.S. at 111 (cleaned up). Injuries in fact must be "concrete," "particularized," and "actual or imminent, not speculative." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Causation requires "that the injury was likely caused by the defendant," and redressability requires "that the injury would likely be redressed by judicial relief." *TransUnion LLC*, 594 U.S. at 423. These elements ensure that "federal courts do not adjudicate hypothetical or abstract disputes." *Id.*

And one clear rule: "Congress may not expand by statute the standing limitations imposed upon it by Article III." *Reilly*, 950 F.2d at 41 (citing Supreme Court precedent). Yet it seems Congress tried to do just that with Section 7604.

Instead of "what's it to you?," the statute asks a broader question: "What's it to anyone, anywhere, at any time?" Under Section 7604, the injury need not be specific to the citizen-plaintiff, and the available remedies don't accomplish any individual relief. About anyone can sue, even for reasons wholly divorced from environmental considerations; just witness how the plaintiff here is a self-interested economic actor seeking to preserve a favorable state contract. *See Bennett v. Spear*, 520 U.S. 154 (1997). And civil penalties don't "remediat[e]" a citizen-plaintiff's "own injury" anyway. *Steel*

*Co.*, 523 U.S. at 106. The penalties "vindicate[] the rule of law." *Id.* Declaratory judgments in many cases—like this one—are "worthless to all the world" because the violator doesn't and can't deny a violation. *Id.* at 106. And injunctions have limited utility. They "would remedy" only "continuing violation[s]" or "imminen[t]" future ones that concretely harm plaintiffs. *Id.* at 108. So Section 7604 already presses on the outer boundary keeping matters from crossing into the "hypothetical" and "abstract."

The Supreme Court in *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000), tried to pull citizen suits back from that edge—but only by threading a narrow constitutional needle. The Court held that "[t]o the extent [civil penalties] encourage defendants to discontinue *current* violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of *ongoing* unlawful conduct." *Laidlaw*, 528 U.S. at 185-86 (emphasis added). That rationale works. A court can order a defendant to stop a *present*, concrete harm—ongoing violations causing real and current injury to the plaintiff. The judgment does something real: it abates a violation that is happening right now. *See id.* at 187-88 (squaring decision with *Steel Co.* and specifying that issue before the Court was "standing to seek penalties for

violations that are ongoing … and that could continue into the future if undeterred").

Since *Laidlaw*, the Supreme Court has said it more plainly: a concrete, nonspeculative injury is a constitutional "hard floor." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). Without that, citizen suits would "exceed Article III's limitations." *Id.* (cleaned up). "[T]he public interest that private entities comply with the law cannot be converted into an individual right by a statute that denominates it as such, and that permits all citizens (or, for that matter, a subclass of citizens who suffer no distinctive concrete harm) to sue." *TransUnion LLC*, 594 U.S. at 428 (cleaned up).

A wholly prospective citizen suit doesn't just hit that floor, it crashes through it.

Start with the more fundamental problem. A suit alleging no present violation asks a federal court to adjudicate a dispute that does not yet exist. The defendant is in full compliance with the CAA. The court has no wrong to redress, no conduct to enjoin, and no harm to analyze. (Take in the facts here: the plaintiff sued because it *expects* SIP non-compliance must be rectified, and it *expects* that restoration of its own commercial contract will be the remedy.) What the court is being asked to do is opine on whether the defendant *might*

violate the law at some future point—and to threaten penalties if the defendant does. But "[f]ederal courts do not exercise general legal oversight" or "issue advisory opinions." *TransUnion*, 594 U.S. at 423-24. They resolve "real controvers[ies] with real impact on real persons." *Id.* at 424 (cleaned up). A wholly prospective suit has none of that. It risks "transform[ing] the least dangerous branch into the most dangerous one." *Missouri v. Jenkins*, 515 U.S. 70, 132 (1995) (Thomas, J., concurring).

The concreteness problem is just as serious. Without an ongoing violation to anchor the claim, the citizen plaintiff cannot show that the threatened harm is "sufficiently imminent and substantial." *TransUnion LLC*, 594 U.S. at 435. "[S]tanding to obtain future injunctive relief does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 2 (2025) (Kavanaugh, J., concurring). And a free-floating fear of future noncompliance will normally not pass muster. *See Summers*, 555 U.S. at 495-96. If civil penalties are what plaintiffs seek, *Laidlaw*'s deterrence rationale evaporates. Civil penalties cannot "encourage defendants to discontinue *current* violations," *Laidlaw*, 528 U.S. at 185-86, when no current violations exist. What the wholly prospective plaintiff is left with is what the Court has condemned: pursuit of the

"undifferentiated public interest" in future compliance. That end game doesn't present a cognizable Article III injury, but a generalized grievance.

Another way to look at this Article III problem is through the lens of ripeness. "The doctrines of standing and ripeness originate from the same Article III limitation." *Jensen v. R.I. Cannabis Control Comm'n*, 160 F.4th 18, 24 (1st Cir. 2025) (cleaned up). "While standing is concerned with 'who' is bringing the challenge, ripeness is concerned with 'when' the challenge is brought." *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 52 (1st Cir. 2021). And the analysis focuses on "fitness" and "hardship." *Id.*

Citizen suits targeting potential future violations will struggle with both fitness and hardship. On the fitness side, the facts are not established; it may be that the SIP can be amended or complied with in some as-yet-unanticipated way, or anticipated environmental consequences might never come to be. And on the hardship side, when the suits are directed at States, the hardship can be substantial. Indulging a citizen and enjoining the State "clearly inflicts irreparable harm on the State" by depriving it of "[t]he []ability to enforce its duly enacted plans." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). New Hampshire is suffering that bitter injury right now.

* * *

So the narrower reading does double duty.  It is what the text says.  And it is what the constitutional avoidance canon demands.  The district court erred in not applying it.

**CONCLUSION**

The Court should reverse.

Respectfully submitted,

JOHN B. MCCUSKEY
   ATTORNEY GENERAL

/s/ Michael R. Williams
Michael R. Williams (1218851)
   *Solicitor General*
   *Counsel of Record*

Holly J. Wilson (1213754)
   *Principal Deputy Solicitor*
   *General*

OFFICE OF THE ATTORNEY
GENERAL OF WEST VIRGINIA
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
mwilliams@wvago.gov
hwilson@wvago.gov

Dated:  May 11, 2026          *Counsel for State of West Virginia*

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

STEPHEN J. COX
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

JAMES UTHMEIER
Attorney General
State of Florida

CHRIS CARR
Attorney General
State of Georgia

RAÚL LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS KOBACH
Attorney General
State of Kansas

RUSSELL COLEMAN
Attorney General
State of Kentucky

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

CATHERINE L. HANAWAY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW WRIGLEY
Attorney General
State of North Dakota

## ADDITIONAL COUNSEL

DAVE YOST
Attorney General
State of Ohio

GENTNER DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

DEREK BROWN
Attorney General
State of Utah

KEITH G. KAUTZ
Attorney General
State of Wyoming

# CERTIFICATE OF COMPLIANCE

1.     This amicus curiae brief complies with Fed. R. App. P.  29(a)(5) because it contains 6,496 words.

2.     This amicus curiae brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as required by Fed. R. App. 27(d)(1)(E), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

/s/ Michael R. Williams
Michael R. Williams